IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HANNAH CHANDLER,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        1:15CV337
                                    )
FORSYTH TECHNICAL COMMUNITY         )
COLLEGE; NANCY RAPP, in her         )
individual and official            )
capacities; WARREN HODGES, in      )
his individual and official        )
capacities; JOE MCINTOSH, in       )
his individual and official        )
capacities; CARLA CREWS, in her    )
individual and official            )
capacities; DEANA RAY, in her      )
individual and official            )
capacities; ANNETTE HEDRICK,       )
in her individual and official     )
capacities; PAMELA VIDAL, in       )
her individual and official        )
capacities; and JOHN DOES 1-20,    )
in their individual and            )
official capacities,               )
                                    )
            Defendants.             )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

    Plaintiff Hannah Chandler ("Plaintiff"), proceeding pro se,

commenced this action by filing a Complaint in the United States

District Court for the Middle District of North Carolina against

Defendants Forsyth Technical Community College, Nancy Rapp,

Warren Hodges, Joe McIntosh, Carla Crews, Deana Ray, Annette

Hedrick, Pamela Vidal, and John Does 1-20 in their individual and official capacities (collectively "Defendants").

Presently before this court is Defendants' Motion for Judgment on the Pleadings. (Doc. 14.) Plaintiff filed a response in opposition (Doc. 24), and Defendants filed a reply. (Doc. 27.) The matter is now ripe for adjudication and, for the reasons stated below, this court will grant the motion.

I.   **BACKGROUND**

The following facts are drawn from the Complaint and are presented in the light most favorable to Plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014) (citation omitted).

Plaintiff was a student at Forsyth Technical Community College pursuing an Associate's Degree in Paralegal Technologies. (Complaint ("Compl.") (Doc. 2) at 2.) She and her sister were enrolled in Legal Research and Writing I in Fall 2014, which was taught by Defendant Nancy Rapp. ("Defendant Rapp") (See id. ¶¶ 1-2.) The claims at issue in this case arise out of an interaction with Defendant Rapp on November 5, 2014, and the response by Forsyth Community College and its employees.

-2-

## A.  __November 5, 2014__

On November 5, 2014, at approximately 5:20 p.m., Plaintiff and her sister entered the Legal Research and Writing I class. (Id. ¶ 1.) When they entered, Defendant Rapp stated, "We're doing group assignments tonight; do not sit in your regular places." (Id. ¶ 2.) Plaintiff alleges that two other students, however, were already seated in their usual places. (Id. ¶ 3.) Plaintiff and her sister allegedly complied with Defendant Rapp's request and moved to alternate locations several times. (Id. ¶ 4.) Although Defendant Rapp repeated her seating instructions as other students entered the room, Plaintiff alleges that none of the other students changed their seats. (Id. ¶¶ 5-6.) Plaintiff alleges that, as a result, she and her sister then returned to their usual seats without any objection from Defendant Rapp. (Id. ¶¶ 7-8.)

After conversing with other students, Defendant Rapp announced, "We are going to get started now. 'Sisters' can't work together tonight. I don't want 'The Sisters' to sit with one another. One of them has to move." (Id. ¶ 9.)[1] When Plaintiff

---

[1] Plaintiff alleges that since the beginning of the semester in August, Defendant Rapp had distinguished Plaintiff and her sister from the class by referring to them as "The Sisters." (Compl. (Doc. 2) ¶ 10.)

replied, "I'm not moving," Defendant Rapp said, "I need one of you to move." (Id. ¶ 11.) A few moments passed as Defendant Rapp and Plaintiff exchanged looks and Plaintiff remained seated and silent. (Id. ¶ 12.) Defendant Rapp then asked, "Is the death stare supposed to scare me?" and Plaintiff replied, "No." (Id. ¶ 13.) Defendant Rapp next called Plaintiff "moody and immature," accused Plaintiff of throwing a temper tantrum, and threatened several times to call security. (Id. ¶ 14.)

As the conflict continued, Defendant Rapp suggested that she and Plaintiff move into the hallway but Plaintiff declined to do so. (Id. ¶ 15.) When Defendant Rapp then said she would give Plaintiff a zero on the assignment and mark her as absent, Plaintiff replied that she could not be given a zero on that assignment because she had submitted it before class as instructed. (Id. ¶¶ 16-17.)[2]

Plaintiff alleges that Defendant Rapp did in fact mark her absent and that this action involved falsification of Plaintiff's official attendance record. (Id. ¶¶ 20-21.) Then, Plaintiff left the classroom. (Id. ¶ 22.) Plaintiff alleges

---

[2] In addition to alleging that Defendant Rapp was unhappy with the class's performance on this particular assignment and was requiring them to redo it, Plaintiff alleges that Defendant Rapp regularly demeaned the intelligence of the students in that class. (Compl. (Doc. 2) ¶¶ 18-19.)

specifically that during the exchange, she remained still in her seat and did not threaten anyone physically or verbally or use inappropriate language. (Id. ¶ 23.) Plaintiff also alleges that the exchange neither interrupted the educational process nor hindered Defendant Rapp from performing her duties. (Id. ¶¶ 25-26.)

### B. **Response to the November 5, 2014 Incident**

Plaintiff alleges that Defendant Rapp did not tell Plaintiff that she had filed a complaint regarding the incident with the school and did not attempt to resolve the issue on a one-on-one basis. (Id. ¶¶ 28-29.) Instead, she alleges that Defendant Rapp emailed Defendant Warren Hodges ("Defendant Hodges") at 6:01 p.m. on November 5, 2014, to inform him about the incident. (Id. ¶ 27.) Defendant Hodges then encouraged Defendant Rapp to confer with Defendant Joe McIntosh regarding the incident, reasoning that "he's the expert[.]" (Id. ¶ 30.) Defendants Rapp, Hodges, McIntosh, Vidal, Ray, and Hedrick then, over the course of the next five days, conferred via email and agreed to order that Plaintiff attend mandatory counseling before she returned to class. (Id. ¶ 31.) Plaintiff further alleges that these Defendants conspired to manipulate the wording on the complaint to meet the requirement for a Student

-5-

Code of Conduct violation of Rule I and to meet the standard required to ensure Behavioral Intervention. (Id. ¶ 32.) These Defendants also allegedly failed to notify Plaintiff of any report or action being taken. (Id. ¶ 33.)

Plaintiff alleges she opened her student email account on November 10, 2014, to find a thread of emails between these Defendants discussing the November 5, 2014 incident and the need for intervention. (Id. ¶ 35.) She then emailed Defendant Hodges and sent a copy to the other Defendants on the original thread. (Id. ¶ 36.) In this email, Plaintiff stated that Defendant Rapp's email omitted and misrepresented a number of facts, claimed that her due process was being violated, and requested a meeting between all the parties. (Id. ¶ 37.) Defendant Hodges responded on November 11, 2014, saying that there was a process outlined in the Student Handbook and that Plaintiff needed to be patient. (Id. ¶ 38.)[3] Later on November 11, 2014, Plaintiff responded to his email, expressing concern over her status on campus and her fear of retaliation and bullying if she returned to class. (Id. ¶ 40.) Defendant Hodges replied on November 12,

---

[3] In the Complaint, Plaintiff notes that the Student Handbook requires that a report be submitted to a student within forty-eight hours of an alleged incident. (Compl. (Doc. 2) ¶ 39.)

-6-

Case 1:15-cv-00337-WO-JLW   Document 31   Filed 08/19/16   Page 6 of 74

2014, stating, "You have now received an e-mail from Carla Crews. You should follow her instructions at this point." (Id. ¶ 41.)

Defendant Carla Crews ("Defendant Crews") emailed Plaintiff at 8:07 a.m. on November 12, 2014, and then, at 8:30 a.m., called Plaintiff's home and requested to speak with her.[4] (Id. ¶ 42.) Plaintiff's father told Defendant Crews that Plaintiff was unavailable and took a message. (Id. ¶ 43.) Plaintiff later returned Defendant Crews' call and scheduled a meeting for 11:30 a.m. on November 13, 2014. (Id. ¶ 44.)

At the November 13, 2014 meeting, upon entering, Plaintiff requested and received permission to record the counseling session. (Id. ¶ 45.) Plaintiff's mother and sister also attended the session. (Id.) As Defendant Crews began to discuss the situation, Plaintiff requested a copy of Defendant Rapp's report. (Id. ¶¶ 46-47.) Plaintiff alleges that this was the first opportunity she had to read the official complaint, as

---

[4] This court notes that in the Complaint itself, Plaintiff alleges that Defendant Crews called and requested to speak with Nancy Rapp. (Compl. (Doc. 2) ¶ 42.) However, given that the Complaint indicates that Defendant Crews called Plaintiff's home (id.) and that Plaintiff was unavailable to speak (id. ¶ 43), this court believes Plaintiff actually intended to write "Plaintiff" in the allegation regarding to whom Defendant Crews requested to speak.

Defendants had failed to ensure that she had a copy of it. (Id. ¶¶ 48-49.) Defendant Crews then allegedly decided, based on Defendant Rapp's written account of the event, that Plaintiff had violated Rule I of the Student Code of Conduct: Disruption and Disorderly Conduct. (Id. ¶ 50.)

Plaintiff alleges that she continued to request a hearing and a face-to-face meeting with her accuser and that she emphasized her distress that Defendants allegedly were refusing to acknowledge her due process rights. (Id. ¶ 51.) She further alleges that she informed Defendant Crews of her grievances with Defendant Rapp, (id. ¶ 52), and that Defendant Crews confirmed both that the meeting was a disciplinary action, (id. ¶ 53), and that Defendant Rapp had marked Plaintiff absent on November 5, 2014. (Id. ¶ 54).

Plaintiff alleges that Defendant Crews was unsure of how Plaintiff should proceed at that point, given that she was only familiar with the educational procedures, and that she suggested that Plaintiff meet with someone on the instructional side. (Id. ¶ 55.) After unsuccessfully attempting to locate Defendant Hodges, Defendant Crews initiated a meeting with Defendant Deana Ray ("Defendant Ray"). (Id. ¶ 56.) Plaintiff's continued request for a face-to-face meeting with Defendant Rapp was denied. (Id.

-8-

¶ 57.) Plaintiff alleges, however, that school procedure
requires that any employee of the college receiving a complaint
concerning a colleague shall encourage the student to speak with
the college employee involved. (Id. ¶ 58.)

Defendant Ray informed Plaintiff that she would not be
allowed to face her accuser, she would not be allowed legal
counsel in a hearing, and the Hearing Committee would include
all Defendants. (Id. ¶ 59.) Plaintiff alleges further that
Defendants Crews and Ray failed to advise Plaintiff of her right
to file a grievance against Defendant Rapp and ignored her
protests that they were violating her due process. (Id.
¶¶ 60-61.) Plaintiff informed Defendants Crews and Ray that she
was considering legal action. (Id. ¶ 63.) Defendant Ray ended
the meeting and informed Plaintiff that the process would
continue. (Id. ¶ 62.)

On November 14, 2014, at approximately 12:50 p.m.,
Defendant Crews telephoned Plaintiff and requested, through
Plaintiff's mother, that Plaintiff sign and personally return a
copy of the Mandatory Counseling Agreement Release of
Confidential Information form to her on campus. (Id. ¶ 64.) She
then emailed the document for copy and signature. (Id. ¶ 65.)
Plaintiff never signed or returned the form. (Id. ¶ 66.)

-9-

As to the specific counts in the Complaint, Plaintiff alleges the following:

In Count I, Plaintiff alleges that Defendant Rapp denied Plaintiff her First Amendment rights to free speech and free association. (Id. ¶ 68.)

In Count II, Plaintiff alleges that Defendant Rapp discriminated against Plaintiff and her sister by distinguishing them from the rest of the class with a name label ("The Sisters") and by insisting that they not work or sit together even though other students were able to choose their own locations and partners. (Id. ¶ 70.)

In Count III, Plaintiff alleges that Defendants violated the Sixth Amendment and her right to due process by failing to notify her of the charges, not allowing her to face her accuser, predetermining her guilt, assessing punishment prior to the hearing, failing to ensure an impartial hearing committee, and denying her access to counsel during the hearing proceedings. (Id. ¶ 72.)

In Count IV, Plaintiff alleges that the Mandatory Counseling Release of Confidential Information Form is an attempt to circumvent the Family Educational Rights and Privacy Act ("FERPA") and Health Insurance Portability and

Accountability Act ("HIPAA") and that Defendants violated her right to privacy by discussing the matter before notifying her and receiving a signed copy of the aforementioned form. (<u>Id.</u> ¶¶ 74-75.)

In Count V, Plaintiff alleges that Defendant Rapp falsified official government documents by marking Plaintiff absent, post-dating the report, omitting pertinent facts, changing the facts to benefit her narrative, and stating in an email that she did not have Plaintiff's contact information. (<u>Id.</u> ¶ 77.) Plaintiff further alleges that Defendants Hodges, McIntosh, Ray, Vidal, Hedrick, and Crews were complicit by allowing Defendant Rapp to commit these actions. (<u>Id.</u> ¶ 78.)

In Count VI, Plaintiff alleges that Defendant Rapp's email and counseling referral form contained defamatory marks, such as "ranted," "stormed-out," "moody," and "immature." (<u>Id.</u> ¶ 80.)

In Count VII, Plaintiff alleges that Defendant Forsyth Technical Community College's disciplinary procedures deny students equal protection as guaranteed under the Fourteenth Amendment of the United States Constitution and Section Nineteen of the North Carolina Constitution. (<u>Id.</u> ¶ 82.) She also alleges that Rule I of the Student Code of Conduct is vague and overly broad. (<u>Id.</u> ¶ 83.)

-11-

In Count VIII, Plaintiff alleges that Defendants Rapp, Hodges, McIntosh, Vidal, Ray, and Hedrick conspired and manipulated the wording on the complaint with the expressed intent to meet the requirement for violation of Rule I of the Student Code of Conduct and the standard required to ensure Behavioral Intervention. (Id. ¶ 85.)

In Count IX, Plaintiff alleges that Defendant Rapp's written and verbal characterizations and her conduct during this incident constitute bullying under N.C. Gen. Stat. § 115C-407.15. (Id. ¶ 87.)

In Count X, Plaintiff alleges that Defendants' conduct caused her embarrassment, humiliation, mental stress and anguish, delayed graduation, delayed earnings, reduction in earnings, reduction of retirement benefits, and loss of educational and employment opportunities. (Id. ¶ 89.)

## II. __LEGAL STANDARD__

Filings by pro se litigants are entitled to liberal construction. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted); Boag v. MacDougall, 454 U.S. 364, 365 (1982). This standard is generous, as courts "impose on pro se litigants — even those who may be cantankerous or make extraneous and inappropriate assertions against their opponents

-12-

or the court — 'less stringent standards . . . .'" <u>Sinclair v.</u>
<u>Mobile 360, Inc.</u>, 417 F. App'x 235, 243 (4th Cir. 2011)
(citation omitted). Further, when employing this liberal
construction, "where the context . . . makes clear a litigant's
essential grievance, the complainant's additional invocation of
general legal principles need not detour the district court from
resolving that which the litigant himself has shown to be his
real concern." <u>Id.</u> (citation omitted). <u>But see</u> <u>Beaudett v. City</u>
<u>of Hampton</u>, 775 F.2d 1274, 1278 (4th Cir. 1985) ("Principles
requiring generous construction of <u>pro se</u> complaints are not,
however, without limits. . . . [They do] not require those
courts to conjure up questions never squarely presented to them.
District judges are not mind readers. Even in the case of <u>pro se</u>
litigants, they cannot be expected to construct full blown
claims from sentence fragments . . . .").

Under Federal Rule of Civil Procedure 12(c), a party may
move for judgment on the pleadings "[a]fter the pleadings are
closed — but early enough not to delay trial." Fed. R. Civ. P.
12(c). Such motions are "designed to dispose of cases when the
material facts are not in dispute and the court can judge the
case on its merits by considering the pleadings." <u>Preston v.</u>
<u>Leake</u>, 629 F. Supp. 2d 517, 521 (E.D.N.C. 2009).

-13-

Rule 12(c) motions are judged by the same standards as Rule 12(b)(6) motions. Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). Thus,

> a motion for judgment on the pleadings "should only be granted if, after accepting all well-pleaded allegations in plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."

Id. (citations omitted). However, Rule 12(c) motions are limited in scope and courts must be "mindful that '[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact.'" Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014); Drager, 741 F.3d at 474 (citation omitted).

When assessing a Rule 12(c) motion, the complaint, "the answer and any documents incorporated by reference in the pleadings may be considered. The 'factual allegations of the answer are taken as true, to the extent "they have not been denied or do not conflict with the complaint."'" Blue Rhino Glob. Sourcing, Inc. v. Well Traveled Imps., Inc., 888 F. Supp. 2d 718, 721 (M.D.N.C. 2012) (citations omitted). However, courts "are not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,'

-14-

or that 'contradict matters properly subject to judicial notice or by exhibit.'" <u>Massey</u>, 759 F.3d at 353 (citations omitted).

## III. <u>PROCEDURAL STANDING</u>

Initially, in her response in opposition, Plaintiff challenges Defendants' motion as filed too soon, because discovery has not finished. (Pl.'s Obj. and Resp. to Defs.' Mot. for Judgement on the Pleadings (Doc. 24) at 2; Pl.'s Mem. in Supp. of Obj. and Resp. to Defs.' Mot. for Judgement on the Pleadings ("Pl.'s Mem.") (Doc. 25) at 2-3.) Plaintiff also contends that Defendants improperly failed to give notice of their motion to her and did not confer in good faith with her before filing their motions. (Pl.'s Mem. (Doc. 25) at 3.) In support, she cites to a Local Rule governing summary judgment motions. (<u>Id.</u> (citing LR 56.1).)

-15-

The motion at issue is a Rule 12(c) motion for judgment on the pleadings.[5] Plaintiff's reliance on Local Rules governing summary judgment motions is misplaced, as those provisions are irrelevant at this juncture. Thus, Plaintiff's contention regarding timeliness is without merit and the matter is ripe for adjudication.

## IV.  <u>ANALYSIS</u>

Plaintiff's Complaint (Doc. 2) sets out ten counts: (1) First Amendment violations, (2) discrimination, (3) Sixth Amendment violations, (4) right to privacy violations, (5) falsification of government records, (6) defamation, (7) equal protection violations, (8) conspiracy, (9) bullying, and (10) right to life. (<u>See</u> Compl. (Doc. 2) at 14-18.)

---

[5] If this court were to rely upon evidence outside of the pleadings, Federal Rule 12(d) would convert the 12(c) motion for judgment on the pleadings into one for summary judgment. Fed. R. Civ. P. 12(d); <u>see</u> <u>McBurney v. Cuccinelli</u>, 616 F.3d 393, 410 (4th Cir. 2010). If and only if that occurred, this court would have to give the parties "a reasonable opportunity for discovery" before the conversion from Rule 12(c) to summary judgment occurred. <u>Aylward v. Fed. Emergency Mgmt. Agency</u>, 781 F. Supp. 2d 272, 273 (W.D.N.C. 2011) (quoting <u>Gay v. Wall</u>, 761 F.2d 175, 177 (4th Cir. 1985)). Logically, the requirement that reasonable opportunity for discovery must be granted before a motion can be converted to one for summary judgment presupposes that there is no such discovery requirement for pre-summary judgment motions. As this court is not converting the motion, it will not trigger discovery provisions or the requirements of Rule 56.

-16-

## A.  **Jurisdiction**

While jurisdiction has not been challenged in the existing motion, the existence of jurisdiction is a "question the court is bound to ask and answer for itself." Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884). Although Plaintiff does not explicitly invoke 28 U.S.C. § 1331's federal question jurisdiction and corresponding supplemental jurisdiction for her state law common law claims, the allegations in the Complaint satisfy this court's jurisdictional mandate to address these issues. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966) (describing pendant jurisdiction as it relates to state and federal claims with a common nucleus of operative fact).

## B.  **Defenses**

As an initial matter, Defendants assert qualified immunity for all of the individual defendants in their individual capacities. (Defs.' Mem. in Supp. of Mot. for Judgment on the Pleadings ("Defs.' Mem.") (Doc. 17) at 8.) This defense is premised on the contention that "[a]s faculty, staff, and administration of a community college, the Individual Defendants are 'government officials performing discretionary functions'"

-17-

and thus they should be "shielded from liability for civil damages[.]" (Id. at 8-9 (citations omitted).)

Plaintiff argues that "[b]y claiming qualified immunity, the Defendants have declared themselves to be public officials acting under the color of state law at the time of the violations, and are, therefore, subject to Constitutional restraints and the Plaintiff is allowed to bring a Section 1983 claim against them." (Pl.'s Mem. (Doc. 25) at 5.) She argues further that "[s]ection 1983 eliminates all claims of immunity by individual local government officers and employees." (Id.)

Contrary to Plaintiff's argument, a plaintiff's mere invocation of § 1983 does not eliminate qualified immunity claims. See City & Cty. of San Francisco v. Sheehan, ____ U.S. ____, ____, 135 S. Ct. 1765, 1774 (2015) ("Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" (citation omitted)); Filarsky v. Delia, ____ U.S. ____, ____, 132 S. Ct. 1657, 1660 (2012) ("Our decisions have looked to these common law protections in affording either absolute or qualified immunity to individuals sued under § 1983.").

As to the proper analysis for qualified immunity, the Fourth Circuit explains:

> When a government official properly asserts qualified immunity, the threshold question that a court must answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" — that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2001)).

Each of the constitutional counts will be analyzed in keeping with this analysis, first assessing whether the plaintiff has properly alleged a constitutional violation and, if so, assessing whether the right was clearly established. However, where the violation is insufficiently alleged, in the interest of efficiency, this court will not go into further, unnecessary analysis regarding whether it was clearly established.

## C.    First Amendment Violations

As an initial attack on Plaintiff's First Amendment claim, (see Compl. (Doc. 2) ¶ 68), Defendants argue that Plaintiff

-19-

failed to sue under 42 U.S.C. § 1983. (Defs.' Mem. (Doc. 17) at 11.) They also argue that "with the exception of the conclusory allegations in her Complaint, Chandler fails to allege any facts in support of her allegations that she engaged in protected speech or that her right of free speech was abridged by the Defendants in any manner[]" and that "there are no facts alleged to support her claim that her 'freedom of association' was abridged except to the extent that Rapp allegedly asked [Plaintiff] and her sister to sit separately and work on an assignment with other classmates for one class." (Id.)

Plaintiff responds that "this is a 42 U.S.C. § 1983 claim[.]" (Pl.'s Mem. (Doc. 25) at 4.)[6] She further characterizes her actions in the classroom as a First Amendment exercise of "a peaceful protest/sit-in." (Id. at 7.) She argues that because there was no threat of harm, punishing her speech or expressive conduct would violate the First Amendment. (Id. at 7-8.)

Defendants reply that Plaintiff's "speech or conduct as alleged . . . in her Complaint is unprotected 'curricular' speech." (Defs.' Reply ("Defs.' Reply") (Doc. 27) at 3 (citation

---

[6] This court determines that given Plaintiff's status as a pro se litigant, any technical flaw in her attempts to incorporate § 1983 is inconsequential and the analysis will focus on the sufficiency of the allegations in her pleadings instead.

omitted).) They further cite to the right of public schools, including colleges, to limit speech and expression by students with respect to core curricular speech. (Id. at 4 (citations omitted) ("Under Brown, a college instructor has the right to establish and enforce reasonable limits in the classroom, even if those limits infringe on the students' speech and expression.").) Defendants cite most specifically to a Ninth Circuit decision applying this rule to the college setting as well as an Alabama federal district court case that adopted its reasoning. (Id. at 3-5 (citations omitted).) For these reasons, they assert that Plaintiff's speech and expression claims fail under Rule 12(c). With respect to freedom of association, Defendants argue that distinguishing individuals as siblings is not a constitutional violation and that requesting students to work with others falls under curricular discretion. (Id. at 6.)

As a general principle, "[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." Virginia v. Black, 538 U.S. 343, 358 (2003) (citations omitted). The First Amendment, however, is not a license for completely unfettered speech and "the government may regulate certain categories of expression . . . ." Id. (citation omitted) ("The protections afforded by the First Amendment,

-21-

however, are not absolute[.]"). Additionally, "[d]etermining

whether the _conduct_ of a particular association amounts to

protected _expression_ is a different and more difficult question

than determining whether a speech act is a form of protected

expression" because "'[e]xpressive conduct enjoys less

protection than . . . pure speech and restrictions on it[] . . .

are more likely to be constitutionally permissible.'" _Goulart v._

_Meadows_, 345 F.3d 239, 247 (4th Cir. 2003) (citations omitted).

The Fourth Circuit outlines the proper order of analysis as

follows:

> when a First Amendment claim is asserted the court
> must begin the inquiry by determining whether the
> plaintiff had engaged in protected speech. If that is
> the case, the court next "must identify the nature of
> the forum, because the extent to which the Government
> may limit access depends on whether the forum is
> public or nonpublic." After determining the type of
> forum, the court must determine whether the
> justifications for the exclusion satisfy the requisite
> standard for that forum.

_Am. Civil Liberties Union v. Mote_, 423 F.3d 438, 442-43 (4th

Cir. 2005 (citations omitted).

In describing what qualifies as protected speech, "[t]he

Supreme Court . . . has stated that the notion of free speech

includes '"the advancement of truth, science, morality, and arts

in general . . . ."' Other courts have similarly indicated that

'[e]ven dry information, devoid of advocacy, political

-22-

relevance, or artistic expression, has been accorded First
Amendment protection.'" Goulart, 345 F.3d at 248 (citations
omitted). Given the interaction of two highly deferential
standards – taking facts in the light most favorable to
Plaintiff in assessing a Rule 12(c) motion and the deference
afforded to pro se litigants – this court will assume without
deciding that Plaintiff's actual statements to her teacher, as
reflected in the Complaint and without any inferences of
negativity or threats, qualified as speech. Similarly, although
expressive conduct can be more easily curtailed, this court will
make the same assumption with respect to her choice to protest
by remaining in her seat.

    Next, the court must qualify both the nature of the forum
and the appropriate amount of restriction allowed in the forum
to determine whether Plaintiff's rights were violated. Three
types of forums exist in the First Amendment analysis: public
forums, non-public forums, and limited (or designated) public
forums. Mote, 423 F.3d at 443 (citation omitted). Examples of
traditional public forums include streets, sidewalks, and parks.
Id. Limited or designated public forums are "not traditionally
public, but the government has purposefully opened [them] to the
public, or some segment of the public, for expressive activity."

Id. (citation omitted). Non-public forums are those not traditionally open to the public. Id. (citation omitted). In the sliding scale of restrictions, there are strong counterweights on the government's ability to restrict speech in public forums, while "[r]estrictions on speech in [] non-public forum[s] should be upheld if they are viewpoint neutral and reasonable 'in light of the purpose of the forum and all the surrounding circumstances.'" Id. (citation omitted).

In the past, the Supreme Court has identified university campuses as non-public forums, absent action by the entity itself on occasion to open its doors and render it a limited public forum. See id. at 444 (citation omitted). Consequently, as the Forsyth Technical Community College is an institution of higher learning, "a 'special type of enclave' that is devoted to higher education," id. (citation omitted), should be deemed a non-public forum. Cf. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) (determining analogously that "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations[]" (citations omitted)). Consequently, even if Plaintiff's speech

-24-

and expressive activity were protected under the First Amendment, the school and teacher would be entitled to make reasonable, viewpoint neutral restrictions on speech in the educational context. See also Brown v. Li, 308 F.3d 939, 947, 951 (9th Cir. 2002) ("However, a review of the cases discussing the relationship between students' free speech rights and schools' power to regulate the content of curriculum demonstrates that educators can, consistent with the First Amendment, restrict student speech provided that the limitation is reasonably related to a legitimate pedagogical purpose.") ("The Supreme Court's jurisprudence does not hold that an institution's interest in maintaining its curriculum and in limiting a student's speech to that which is germane to a particular academic assignment diminishes as students age. Indeed, arguably the need for academic discipline and editorial rigor increases as a student's learning progresses.") (addressing a complaint filed by a graduate school student involving the University of California Santa Barbara); Milward v. Shaheen, Case No. 6:15-cv-785-Orl-31TBS, 2015 WL 8328899, at *4 (M.D. Fla. Oct. 29, 2015) ("Where a student's speech threatens a school's pedagogical and curricular system, it is not subject to the expansive protections applied to student

political speech." (citing <u>Heenan v. Rhodes</u>, 757 F. Supp. 2d 1229, 1238 (M.D. Ala. 2010)) (addressing a college's policy as it related to speech). Even in taking all reasonable inferences in favor of Plaintiff, a teacher restricting what could be said in an ongoing class (and, even more compelling, in response to instructions, rather than in response to a debate or other viewpoint-driven activity) and behavior in the classroom, including attempts to protest during class, is reasonable in context of the need to keep order in a classroom, to further the educational mission, and to allow the teacher to promote her lesson plan.[7] Consequently, under Rule 12(c), Plaintiff's

---

[7] An additional line of analysis showing the futility of Plaintiff's pleadings with respect to the alleged First Amendment violations is clear from <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503 (1969). Despite the distinction between primary and secondary schools and community colleges, certain "special characteristics of the school environment" still inform the relevant analysis. <u>Id.</u> at 506. In <u>Tinker</u>, a regulation prohibiting silent protest by the wearing of political symbols was contrasted with legitimate regulations on disruptive behavior in the academic context. <u>Id.</u> at 509, 513 ("But conduct by the student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." (citation omitted)). <u>But see</u> <u>id.</u> at 515 (Stewart, J., concurring) (emphasizing that disruption concerns are much stronger in secondary schools and that college or university students may have greater freedom of speech); <u>Nitzberg v. Parks</u>, 525 F.2d 378, 382 (4th Cir. 1975) (citation omitted).

-26-

pleadings are insufficient to allege First Amendment violations with respect to speech or expressive activity acting as speech.

Plaintiff's first claim also alleges a violation of freedom of association. (Compl. (Doc. 2) ¶ 68.) "The First Amendment protects two types of association: intimate association and expressive association." Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 146 (4th Cir. 2009) (citing Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)) (addressing procedural due process and freedom of association). While "intimate association consists of the choice to 'enter and maintain [an] intimate human relationship[,]'" expressive association is "the 'right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion.'" Id. (citing Roberts, 468 U.S. at 617-18)).

In Roberts v. United States Jaycees, 468 U.S. 609 (1984), the Supreme Court determined that, "because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the state." Id. at 618 (citations omitted). Further, "[t]he personal affiliations that exemplify

-27-

these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family," including "cohabitation with one's relatives." Id. at 619 (citations omitted). Family relationships therefore are generally afforded greater protection under intimate association standards than other types of relationships. See id. at 619-20.

However, Plaintiff does not allege any action by state actors to deprive her of her right to intimate association. The choice to have Plaintiff and her sister work in different groups was based on a curricular decision and did not deprive them of the opportunity to have and develop familial bonds in any other context. Cf. Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987) (describing only marriage, begetting and bearing of children, childrearing and education, and cohabitation with relatives as "[t]he intimate relationships to which we have accorded constitutional protection" (citations omitted)).

Finally, Plaintiff argues that her expressive conduct was circumscribed in violation of the First Amendment because she did not engage in "a serious expression of intention to inflict

bodily harm as deemed under the True Threat Doctrine." (Pl.'s Mem. (Doc. 25) at 7.) However, expressive conduct is not given carte blanche under the First Amendment. See, e.g., Virginia v. Black, 538 U.S. 343, 358 (2003) (citation omitted). The Supreme Court has explained that "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). As to conduct-based expression,

> [i]t is also true that a message may be delivered by
> conduct that is intended to be communicative and that,
> in context, would reasonably be understood by the
> viewer to be communicative. Symbolic expression of
> this kind may be forbidden or regulated if the conduct
> itself may constitutionally be regulated, if the
> regulation is narrowly drawn to further a substantial
> governmental interest, and if the interest is
> unrelated to the suppression of free speech.

Id. at 294 (citation omitted). Expressive conduct can be determined "under the test articulated in Texas v. Johnson." Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386, 392 (4th Cir. 1993) (citation omitted). "[T]he Johnson test for determining the expressiveness of conduct requires '"[a]n intent to convey a particularized message"' and a great likelihood '"that the message would be understood by those who viewed it."'" Id. (citations omitted).

-29-

However, colleges are not subject to the allegedly expressive whims of their students. As the Fourth Circuit reasoned in <u>Glover v. Cole</u>, 762 F.2d 1197 (4th Cir. 1995), "Plaintiffs' activities [in that instance] may be at the core of the first amendment, but the college has a right to preserve the campus for its intended purpose and to protect college students . . . ." <u>Id.</u> at 1203. Plaintiff's case lends itself to similar reasoning: even if Plaintiff's activity qualifies as expressive conduct and a sit-in protest, the fact remains that her allegations make clear that her actions interrupted the educational process in which Defendant Rapp sought to engage. It is appropriate for Defendant Rapp to control the educational environment and limit Plaintiff's speech to the extent that it interfered with the educational mission of the institution and locale where this interaction took place. Consequently, even under a generous reading of both the law and facts, Plaintiff has failed to allege sufficiently that her First Amendment right to expression was violated.

To the extent Plaintiff argues that Defendant Rapp's behavior was based on bias and that "she defined her bias as one based on association, creating a sub-class within the classroom[,]" (Pl.'s Mem. (Doc. 25) at 6), it appears she may be

seeking to articulate an Equal Protection argument. Her Equal

Protection argument will be analyzed _infra_. Additionally,

Plaintiff's contentions that Defendant Rapp engaged in

"unprotected speech" and "disturbed the peace" are irrelevant to

analysis of whether Plaintiff's constitutional rights were

violated and thus will not be considered. (_Id._ at 8.)

Consequently, Defendants' motion will be granted as to

Count I.

### D.  **Discrimination**

Plaintiff alleges that Defendant Rapp discriminated against

Plaintiff and her sister by distinguishing them from the rest of

the class "by labeling and addressing them as 'The Sisters'" and

by preventing them from working and sitting together, even

though she "allow[ed] the other students their choice of

location and partner." (Compl. (Doc. 2) ¶ 70.) Defendants assert

that Plaintiff "does not invoke any law that was allegedly

violated, and indeed she cannot because this allegation fails to

state a claim for _any_ type of unlawful discrimination." (Defs.'

Mem. (Doc. 17) at 11.) They also argue that, to the extent

Plaintiff alleges Defendant Rapp acted disrespectfully, her

alleged actions were aimed at the entire class and thus

inconsistent with the concept of discrimination. (_See_ _id._;

-31-

Defs.' Reply (Doc. 27) at 6.) Finally, they assert that
Defendant Rapp's directions fell within her curricular
discretion and do not constitute discrimination. (Defs.' Reply
(Doc. 27) at 6.)

Plaintiff's response is combined with her response to
attacks on her First Amendment allegations. To the extent
Plaintiff's second count alleges anything beyond her First
Amendment claims, it focuses on an allegation of being singled
out, a matter more properly discussed under the Equal Protection
analysis located infra.

Consequently, Defendants' motion to dismiss will be granted
with respect to this count.

### E.   Sixth Amendment Violations

The third count, "Sixth Amendment Violations," alleges that
"Defendants violated Plaintiff's due process by: 1) Failing to
notify Plaintiff of the charges; 2) Denying the Plaintiff the
right to face her accuser; 3) Predetermining Plaintiff's guilt;
4) Assessing punishment before a Hearing; 5) Failing to ensure
an impartial Hearing Committee; and 6) Denying Plaintiff Counsel
in Hearing Proceedings." (Compl. (Doc. 2) ¶ 72.) Defendants
argue that as the Sixth Amendment explicitly applies only to

criminal prosecutions, Plaintiff's invocation of its protections is meritless. (Defs.' Mem. (Doc. 17) at 11-12.)

Plaintiff clarifies that she is focused on a violation of her due process rights in the context of a deprivation of her rights, privileges, or immunities. (Pl.'s Mem. (Doc. 25) at 8-9.) Thus, it appears that her true claim involves lack of due process in an academic disciplinary action, specifically, removing her from class. In reply, Defendants assert that students involved in academic disciplinary proceedings have some process rights but those rights are not on par with the rights afforded to defendants in criminal prosecutions. (Defs.' Reply (Doc. 27) at 6-7.)

The Sixth Amendment itself states that it covers "all criminal prosecutions," U.S. Const. amend. VI (emphasis added), and thus Plaintiff's Complaint is not within its bounds. However, this court is mindful of its obligation to look at the context of a pro se litigant's complaint and to address her real concern, rather than being distracted by "the complainant's additional invocation of general legal principles." Sinclair, 417 F. App'x at 243 (quoting Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985)). Here, although Plaintiff invokes the Sixth Amendment, her concern is about the alleged

-33-

lack of process, as she highlights a lack of notice, an inability to provide her side of the story or to change their minds, the illegitimacy of a hearing with a pre-determined outcome, and an inability to bring counsel. (Compl. (Doc. 2) ¶ 72; see also Pl.'s Mem. (Doc. 25) at 8-9.) For this reason, while this court rejects any Sixth Amendment claim, it will consider the due process claims inherent in Plaintiff's pro se Complaint.

"[T]o be entitled to a due process hearing, one must have suffered by the state action a loss of either a property or a liberty interest." Clark v. Whiting, 607 F.2d 634, 641 (4th Cir. 1979) (citation omitted). As a general matter, "[i]n the absence of a constitutional or statutory deprivation, the federal courts should be loath to interfere with the organization and operation of an institution of higher education." Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 629 (4th Cir. 2002) (citations omitted).

In assessing the process allegedly accorded to Plaintiff, this court notes that "not every departure from a state agency's stated or customary procedures constitutes a denial of constitutionally guaranteed procedural due process." Jones v. Bd. of Governors of Univ. of N.C., 704 F.2d 713, 716-17 (4th

-34-

Cir. 1983) (citations omitted); see also Kowalski v. Berkeley Cty. Schs., 652 F.3d 565, 576 (4th Cir. 2011). Additionally, "[s]tate school board policies and police department regulations derive the basic legal authority they possess from state law" and "violations of state law are insufficient by themselves to implicate the interests that trigger a due process claim." Wofford v. Evans, 390 F.3d 318, 325 (4th Cir. 2004) (citation omitted). However, "significant departures from stated procedures of government and even from isolated assurances by governmental officers which have induced reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute procedural due process violations." Jones, 704 F.2d at 717 (citations omitted). The Fourth Circuit observed, as to this potential gray area, that

> [a] governmental body may frequently extend to a
> disgruntled party a hearing, even though the party is
> not entitled of right to such a hearing. But, we do
> not subscribe to the view that such an act of courtesy
> ripens automatically into an act of right generating
> all the requirements of a trial-type due process
> hearing . . . .

Clark, 607 F.2d at 642.

The first part of the inquiry "'in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty."' Whether a deprivation of constitutional rights has occurred is not

-35-

dependent upon the subjective feelings or beliefs of a plaintiff." Tigrett, 290 F.3d at 628 (citations omitted). Further, "[t]he Supreme Court has assumed, without actually deciding, that university students possess a 'constitutionally protectable property right' in their continued enrollment in a university." Id. at 627 (citation omitted). However, there is no allegation that the school terminated Plaintiff's enrollment at Forsyth Technical Community College; consequently, even the assumed-but-not-decided right to continued enrollment would not be implicated.[8] Indeed, in her supportive briefing, Plaintiff emphasizes that Defendant "Rapp kicked the Plaintiff out of class[,]" (Pl.'s Mem. (Doc. 25) at 9), and focuses on her supposed punishment (mandatory counseling and the form required prior to returning to class), (Id. at 14-15), rather than a lost

---

[8] This court also finds persuasive the following explanation: "Although students may have some substantive due process rights while they are in school, education itself is not a fundamental right. Moreover, the right to a graduate school education is not deeply rooted in this nation's history and traditions." Stephenson v. Cent. Mich. Univ., 897 F. Supp. 2d 556, 568 (E.D. Mich. 2012) (citation omitted). To the extent that North Carolina cases describe a state constitutional entitlement to the opportunity for a sound basic education, that educational provision is limited to lower, public schools. See Leandro v. State, 346 N.C. 336, 347, 488 S.E.2d 249, 255 (1997).

-36-

protectable property right.[9] For these reasons, the court will grant Defendants' motion as to Count III.

However, given Plaintiff's pro se status, this court will also consider the implications for due process principles based on her alleged reliance on published school procedures in the area of academic discipline.

Analogous for these inquires, "[a]lways the question is, . . . that 'once it is determined that due process applies, the question remains what process is due.' . . . [T]here are many situations where but minimal due process rights, limited at most to notice and a right to be heard, are required." Clark v. Whiting, 607 F.2d 634, 643 (4th Cir. 1979) (citations omitted).

In addressing whether a short (less than ten days) public school suspension necessitated due process guarantees, the Supreme Court noted that "requiring effective notice and

_____

[9] Further, as to any stigma Plaintiff claims to have suffered as a negative result of the classroom interaction: the Supreme "Court [has] made clear that there is no constitutional right to be free from stigma," Iota Xi, 566 F.3d at 148, and further "[p]ublication of stigmatizing charges alone, without damage to 'tangible interests such as employment,' does not invoke the due process clause." Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990) (citing Paul v. Davis, 424 U.S. 693, 701 (1976)). "[T]he Court has plainly and repeatedly recognized that an injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest." Tigrett, 290 F.3d at 628 (citation omitted).

-37-

informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action." Goss v. Lopez, 419 U.S. 565, 583 (1975).

In Henson v. Honor Committee of University of Virginia, 719 F.2d 69 (1983), the Fourth Circuit addressed a party's "principal contention . . . that the Honor Code procedures violate due process in two critical respects: (1) the student is denied the right to have experienced legal counsel conduct his defense and cross-examine witnesses; and (2) the student is denied the right to have the hearing subject to the traditional rules of evidence." Id. at 73. The court found that "[i]n the academic setting particularly, the Supreme Court has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding." Id. at 74 (citation omitted). This is because schools need to "have greater flexibility in fulfilling the dictates of due process than a court or an administrative agency." Id. (citation omitted) ("[D]isciplinary proceedings require more stringent procedural protection than academic evaluations, . . . Labeling a school proceeding disciplinary in nature, however, does not mean that complete adherence to the judicial model of decisionmaking is required." (citation omitted)). Distinguishing

-38-

Henson from Plaintiff's allegations, however, are the following facts:

> Henson had adequate notice of the charges against him and the opportunity to be heard by disinterested parties. He also was confronted by his accusers and given the right to have a record of the hearing reviewed by a student appellate body. It is true that Henson was not permitted to have a practicing attorney conduct his defense, <u>but this is not a right generally available to students facing disciplinary charges</u>.

<u>Id.</u> at 74 (emphasis added). However, the court noted that they did "not suggest" that the process in this case "represent[s] a model for assuring constitutional due process in all administrative settings." <u>Id.</u>

Similarly, in the lower schools context, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." <u>Bethel Sch. Dist. No. 403 v. Fraser</u>, 478 U.S. 675, 686 (1986) (citation omitted); <u>see also</u> <u>Wofford</u>, 390 F.3d at 323 ("Such leeway is particularly necessary when school discipline is involved. The Court has noted the 'substantial interest of teachers and administrators in maintaining discipline in the classroom.' Educators must be able to respond effectively to the disciplinary exigencies of the moment." (citation omitted)).

-39-

Board of Curators of University of Missouri v. Horowitz,
435 U.S. 78 (1978), discusses "school disciplinary
proceeding[s]," where, in a prior case, the Court nonetheless
did not "require[e] a formal hearing," id. at 89 (citation
omitted), and "[a]cademic evaluations of a student, [which] in
contrast to disciplinary determinations, bear little resemblance
to the judicial and administrative fact-finding proceedings to
which we have traditionally attached a full-hearing
requirement." Id. The distinction hedged on disciplinary
situations, where "[t]he requirement of a hearing, where the
student could present his side of the factual issue, could under
such circumstances 'provide a meaningful hedge against erroneous
action[,]'" versus "the academic judgment of school officials"
that "is by its nature more subjective and evaluative than the
typical factual questions presented in the average disciplinary
decision." Id. at 89-90. In maneuvering this distinction between
academic evaluations and disciplinary proceedings, the Fourth
Circuit observed that

> [t]he educational process is not by nature adversary;
> instead it centers around a continuing relationship
> between faculty and students, 'one in which the
> teacher must occupy many roles — educator, advisor,
> friend, and, at times, parent-substitute.' This is
> especially true as one advances through the varying
> regimes of the educational system, and the instruction
> becomes both more individualized and more specialized.

Id. (emphasis added). It was in this context that the court decided that the value of a hearing in an academic context did not "outweigh[] any resulting harm to the academic environment" — the opposite conclusion from that reached in the disciplinary context in a different case by the Supreme Court. See id. (citations omitted). The Fourth Circuit further observed that "[i]nfluencing this conclusion was clearly the belief that disciplinary proceedings, in which the teacher must decide whether to punish a student for disruptive or insubordinate behavior, may automatically bring an adversary flavor to the normal student-teacher relationship. The same conclusion does not follow in the academic context." Id.

In keeping with this precedent, this court finds persuasive the analysis in Heenan v. Rhodes, 757 F. Supp. 2d 1229 (M.D. Ala. 2010). There, the court held that "[i]t is well-established that, while students facing academic disciplinary proceedings must be granted a 'right to respond' to the relevant charges, the procedural rights of such petitioners 'are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial." Id. at 1243 (citations omitted). Further, "[c]ritical to this caselaw is the recognition that classrooms are not courtrooms, and the law does

not treat them as such." Id. (citations omitted). These points supported the holding that "there is no right to an attorney in school disciplinary proceedings, and the law imposes only basic procedural obligations upon the teachers and administrators who operate academic hearings." Id.

Plaintiff further argues that North Carolina law grants her a right to counsel as a student in a disciplinary proceeding. (Pl.'s Mem. (Doc. 25) at 6 (citing N.C. Gen. Stat. § 116-40.11(a)).) Defendants argue that the first article of this section limits its application to the sixteen schools comprising the University of North Carolina system. (Defs.' Reply (Doc. 27) at 7 (citing N.C. Gen. Stat. §§ 116-1, 116-2(4)).)

The statute itself provides that

[a]ny student enrolled at a constituent institution who is accused of a violation of the disciplinary or conduct rules of the constituent institution shall have the right to be represented, at the student's expense, by a licensed attorney or nonattorney advocate who may fully participate during any disciplinary procedure or other procedure adopted and used by the constituent institution regarding the alleged violation.

N.C. Gen. Stat. § 116-40.11(a) (providing two unrelated exceptions in subsections). Relevant North Carolina statutes define a "constituent institution" as

one of the 16 public institutions of higher education, to wit, the University of North Carolina at Chapel Hill, North Carolina State University at Raleigh, the

-42-

University of North Carolina at Greensboro, the
University of North Carolina at Charlotte, the
University of North Carolina at Asheville, the
University of North Carolina at Wilmington, Appalachian
State University, East Carolina University, Elizabeth
City State University, Fayetteville State University,
North Carolina Agricultural and Technical State
University, North Carolina Central University, North
Carolina School of the Arts, . . . Pembroke State
University, . . . Western Carolina University, and
Winston-Salem State University, and the constituent high
school, the North Carolina School of Science and
Mathematics.

N.C. Gen. Stat. § 116-2(4). Forsyth Technical Community College,
as argued by Defendants, (Defs.' Reply (Doc. 27) at 7), simply
is not a "constituent institution" for purposes of section 116
and thus N.C. Gen. Stat. § 116-40.11 is inapplicable here.

As to the substance of Plaintiff's due process argument,
here, even assuming she had a protectable liberty or property
interest in this proceeding,[10] this court concludes that the
procedural protections she was afforded were sufficient. Cf.
Lewin v. Med. Coll. of Hampton Roads, 910 F. Supp. 1161, 1164-67
(E.D. Va. 1996) (examining a more serious action taken against a
student in the context of procedural due process concerns).
Plaintiff was not being expelled from school; rather, she was

_____

[10] "In assessing a procedural due process claim, '[u]nless
there has been a "deprivation" [of a protected liberty or
property interest] by "state action," the question of what
process is required . . . is irrelevant, for the constitutional
right to "due process" is simply not implicated.'" Iota Xi, 566
F.3d at 146 (citation omitted).

-43-

referred to mandatory counseling after an incident with a
teacher. Plaintiff and the administration met to discuss her
side and the decided-upon discipline was well within the range
of low-scale punishment intended to facilitate the academic
process. Additionally, as has been established, she neither had
a right to a full, formal hearing or procedural protections nor
a right to the counsel of an attorney. Consequently, even taking
reasonable inferences in her favor, any deprivation here simply
did not trigger increased procedural protections.

For these reasons, the court will grant Defendants' motion
as to this count.

F. **Right to Privacy Violations**

Count IV alleges that "[t]he Mandatory Counseling Release
of Confidential Information Form is an attempt to circumvent
FERPA and HIPPA [sic]" and that Defendants "violated Plaintiff's
Right to Privacy by discussing the matter before notifying
Plaintiff and before receiving a signed copy of the Mandatory
Counseling Release of Confidential Information Form, a FERPA
[and] HIPPA [sic] violation[.]" (Compl. (Doc. 2) ¶¶ 74-75.)

As to FERPA, Defendants assert that "FERPA . . . allows
internal communications involving individuals who have a
legitimate reason to know" and consequently "there was no

-44-

violation of the FERPA when the individual Defendants discussed [Plaintiff's] situation among themselves, and there is no allegation that any of the Defendants disclosed [her] information to third parties who did not have a legitimate educational interest in the information." (Defs.' Mem. (Doc. 17) at 12-13 (citing 34 C.F.R. § 99.31(a)(1)(i)(A).) As to HIPAA, they assert that "[t]here is no allegation (or any reason to believe) that Forsyth Tech is a 'covered entity' or 'business associate' within the meaning of the HIPAA privacy rule" and that "there is no indication in the Complaint that any Defendant even had, much less disclosed, [Plaintiff's] [private health information]." (Id. at 13.) Further, they assert that the argument that the release is an attempt to circumvent these privacy provisions does not establish actual violations, particularly as "the mandatory counseling procedure is academic and behavioral in nature, not psychological or medical, and thus falls outside the ambit of the HIPAA privacy rule." (Id.)

Plaintiff argues that her "objection to the Form is based on [its] formatting and wording" and that it is "coercive in nature." (Pl.'s Mem. (Doc. 25) at 14.) She asserts that "this Form is an attempt to share and access student information

-45-

without outside sources, as well as medical information about the student[.]" (<u>Id.</u> at 15.)

In their reply, Defendants re-assert that Plaintiff "has failed to articulate any actionable 'privacy violations' on the part of the Defendants[.]" (Defs.' Reply (Doc. 27) at 8.)

As to the Family Educational Rights and Privacy Act ("FERPA"), the Supreme Court has held that "there is no question that FERPA's nondisclosure provisions fail to confer enforceable rights." <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 287-88, 290 (2002) ("FERPA's nondisclosure provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure.") ("[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms . . . . FERPA's nondisclosure provisions contain no rights-creating language . . . . [and] therefore create no rights enforceable under § 1983."). Thus, there is a serious initial jurisdictional issue as to whether Plaintiff has the right to bring such a claim.

Further, Plaintiff does not allege that she signed the forms and instead wants this court to prospectively determine they cannot be used, a high bar that her allegations fail to support. Finally, she alleges that internal communications

-46-

violated FERPA. However, and as argued by Defendants (see Defs.'
Mem. (Doc. 17) at 12), the relevant federal regulations permit
"disclosure . . . to other school officials . . . within the
agency or institution whom the agency or institution has
determined to have legitimate educational interests." 34 C.F.R.
§ 99.31. Thus, even if Plaintiff had a right of action,
discussion among relevant actors, as alleged, before receiving a
signed form, would not have been a violation. (See Compl. (Doc.
2) ¶ 75.) Therefore, Plaintiff's pleadings are insufficient as
to the FERPA concerns.

As to the Health Insurance Portability and Accountability
Act ("HIPAA"), the same issues arise. First, there is no private
right of action under HIPAA. Melvin v. Naylor, No. 5-14-CV-486-
BO, 2015 WL 7176351, at *4 (E.D.N.C. Nov. 13, 2015) (citations
omitted); Curry v. Heritage Healthcare, No. 1:14cv638, 2014 WL
4114332, at *2 (M.D.N.C. Aug. 20, 2014) (citations omitted);
Atkinson-Bush v. Baltimore Washington Med. Ctr., Inc., No. L-10-
2350, 2011 WL 2216669, at *3 (D. Md. May 25, 2011) (citations
omitted); Baldwin v. Moses H. Cone Mem'l Hosp., No. 1:09CV328,
2009 WL 2242678, at *1 (M.D.N.C. July 24, 2009) (citations
omitted). Similarly to FERPA, for her prospective HIPAA
complaint, there is no indication any violation actually

-47-

occurred (as there is no allegation that Defendants had, never mind shared, any health information) and thus the allegations, even when taken as true, are insufficient.

Thus, Defendants' motion will be granted as to Count IV.

## G. <u>Falsification of Government Records</u>

In Count V, Plaintiff alleges that Defendant Nancy Rapp falsified official government documents by marking Plaintiff absent, post-dating the report, omitting pertinent facts, changing facts to benefit her narrative, and stating (in an email) that she did not have contact information for Plaintiff. (Compl. (Doc. 2) ¶ 77.) She further alleges that other Defendants are "complicit" for allowing Defendant Rapp to commit these alleged actions. (Id. ¶ 78.)

Defendants argue that (1) "Chandler cites no specific statute that Rapp allegedly violated"; (2) "it is not a 'falsification' for Rapp to have marked [her] absent when Rapp specifically warned Chandler that she would be marked absent if she or her sister did not move . . . . [and] [i]t is undisputed that Chandler did in fact miss the majority of the November 5 class"; (3) "[i]t is not a 'falsification' for Rapp to provide her own editorial gloss . . . or for saying in an email . . . that she did not have Chandler's email address . . . ."; and (4)

-48-

"Defendants do not know what Chandler refers to when she says that Rapp 'postdated the report,' and Chandler's failure to make any specific allegations in that regard makes her claim of 'falsification' subject to dismissal." (Defs.' Mem. (Doc. 17) at 14.)

Plaintiff argues in response: "Legally termed 'forgery,' when Rapp dated the Mandatory Counseling Referral Form for November 7, 2014, but did not submit the Form until November 12, 2014, she falsified or forged a government document." (Pl.'s Mem. (Doc. 25) at 15.) Additionally, she argues that marking her absent despite her presence in the room and desire to stay constituted falsification of a government document. (Id.) She also argues that Defendant Rapp stated in an email that she did not have Plaintiff's contact information even though, taking reasonable inferences in Plaintiff's favor, the reports show that she did, constituted a falsification on a government document. (Id.) As to the classroom incident, Plaintiff argues: "When Rapp intentionally provided her 'own editorial gloss' to her report, she omitted the one truly important fact: Rapp had caused and escalated the incident; this is falsification." (Id. at 16.) Finally, Plaintiff argues that although Defendant Rapp's report indicates Plaintiff's claim to being an introvert "was

made during the incident" (claiming the report "implied" this), "the statement was [in fact] made in a private conversation with her sister." (Id.)

Defendants argue that a date discrepancy is not a clear falsification (e.g., filling out a form early but then having a delay in returning it) and did not cause any harm to Plaintiff. (Defs.' Reply (Doc. 27) at 9.) They assert that being marked absent was a disciplinary measure, used transparently, and not a falsification. (Id.) They further argue that a lie about contact information simply fails to rise to a legally cognizable claim. (Id.) Similarly, they argue that because Plaintiff and Defendant Rapp agree on some of the key events in class on November 5, there is no falsification when Defendant Rapp shared her opinion and that any inaccuracies should have been resolved through the community college procedures available to correct the record. (Id.) And again, they argue that even if there was a misunderstanding or lie about the source of the introvert comment, there was both a lack of harm to Plaintiff and a lack of substantive falsity, as it was a claim Plaintiff made, at least to someone. (Id.)

While falsification of government records or reports would be a very serious offense, this court is unable to determine a

potential private right of action Plaintiff would have for the conduct alleged that would not already be encompassed by the generous <u>pro se</u> review this court has already granted to her other counts.[11] Thus, Defendants' motion will be granted as to Count V.

**H.    Defamation**

Count VI alleges that "Defendant Nancy Rapp's email and counseling referral form contained defamatory remarks such as: 'ranted,' 'stormed-out,' 'moody,' and 'immature.'" (Compl. (Doc. 2) ¶ 80.)

Defendants first assert that "by Chandler's own admission, Rapp's statements were true." (Defs.' Mem. (Doc. 17) at 14-15 ("Whether Chandler agrees with it or not, a reasonable person could view this behavior as being 'moody' and 'immature,' as well as a rant. Chandler also admits that she walked out of the

---

[11] To the extent that Plaintiff's claim could be read as an attempt to articulate an action for fraud, <u>see</u> <u>Myers & Chapman, Inc. v. Thomas G. Evans, Inc.</u>, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988) (citation omitted) (listing elements of fraud), this court finds both that some of Plaintiff's contentions — such as, that a form dated a few days prior to turning it in is a falsification rather than a simple delay — are not the result of reasonable inferences and that even if fraud were her intended charge, at the very least she has not shown that <u>she</u> reasonably relied on the assertion and <u>she</u> acted on it, thus failing to establish fraud in North Carolina. <u>See</u> <u>id.</u> (citation omitted). This court simply cannot find grounds on which this count would not be dismissed.

class rather than discuss the issue with Rapp, which could fairly be seen as 'storming out.'"").) Second, they argue that even if Defendant Rapp's comments are not taken as true, "they are non-actionable 'rhetorical hyperbole' . . . that do not give rise to a defamation claim." (Id. at 15-16 (citation omitted).) Third, assuming only for the sake of argument that Defendant Rapp's representations were defamatory, Defendants argue that her account "was subject to a qualified privilege." (Id. at 16-17 (citations omitted).) Applying the qualified privilege standard, Defendants argue that Defendant Rapp had a good-faith interest, right, or duty to communicate with Defendant Hodges regarding the incident and he had a corresponding duty as her supervisor; the communication was made in a manner and under circumstances warranted in the situation; and her descriptions were appropriately limited in scope. (Id. at 17.) Fourth, Defendants argue that Defendant "Rapp's comments do not meet the standard for libel or slander per se and thus Chandler would have to allege that she suffered special (pecuniary) damages as a result of the alleged defamation[]" and, "[b]ecause she has not done so, her defamation claim fails . . . ." (Id. at 17-18 (citations omitted).)

Plaintiff responds that she never admitted that Defendant Rapp's comments were accurate and emphasizes that the issue was not that Defendant Rapp reported the incident to her boss but that she allegedly "made false statements of fact" and did not act in good faith. (Pl.'s Mem. (Doc. 25) at 12-13.) She further argues that because "[t]he other Defendants believed these statements to be true as written by Rapp, . . . according to Common Law, these statements are libelous." (Id. at 13.) She goes on to argue that, based on discovery materials, "Plaintiff now has evidence that shows that Rapp engaged in malicious persecution against the Plaintiff" and that "Rapp was engaged in 'fighting' words, which are not protected speech, and which the Plaintiff has every right to defend herself against." (Id. at 14.)

In reply, Defendants reiterate that "[a]t worst, the Defendants engaged in non-actionable 'rhetorical hyperbole' and/or had a qualified privilege to make the statements that they did." (Defs.' Reply (Doc. 27) at 8.)

First, as to Plaintiff's charge of "malicious persecution" included in her supporting brief, (Pl.'s Mem. (Doc. 25) at 14), this court determines that she intended to articulate a claim for malicious prosecution. Cf. Deegan v. Rudman, No. 3:10-cv-

00016, 2011 WL 251226, at *7 (W.D. Va. Jan. 26, 2011) (citation omitted). In addition to not being included in her Complaint and being irrelevant to defamation, her allegations do not comprise a prima facie case of malicious prosecution. See Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000) ("The common law tort of malicious prosecution is well-established: a prima facie case of malicious prosecution must include (1) the initiation or maintenance of a proceeding against the plaintiff by the defendant; (2) termination of that proceeding favorable to the plaintiff; (3) lack of probable cause to support that proceeding; and (4) the defendant's malice." (citation omitted)).

As to Plaintiff's defamation and libel claims: Defendants initially argue the actual truth of Defendant Rapp's characterizations of Plaintiff's behavior. (Defs.' Mem. (Doc. 17) at 14-15.) Given the deferential Rule 12(c) standard, the court determines that it cannot infer the actual truth of these characterizations. Consequently, this court will not grant the motion as to the defamation count based on actual truth.

In North Carolina, defamation includes a written version, libel, and an oral version, slander. Pierce v. Atl. Grp., Inc., 219 N.C. App. 19, 33, 724 S.E.2d 568, 578 (2012) (citation

-54-

omitted). At issue here are statements made in an email and referral form, thus implicating libel principles. Three elements are required for a libelous defamation: first, that the defendant made defamatory statements of or concerning the plaintiff; second, that the statements were published to a third person; and third, that the statements caused an injury to the plaintiff's reputation. Id. (citation omitted).

Further, "North Carolina courts recognize three classes of libel[,]" which include:

> (1) Publications which are obviously defamatory and which are termed libels per se; (2) publications which are susceptible of two reasonable interpretations, one of which is defamatory and the other is not, and (3) publications which are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances. This type of libel is termed libel per quod.

Id. (citation omitted). Libel per se is "summarized . . . [as] 'words . . . susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided . . . .'" Tyson v. L'Eggs Prods., Inc., 84 N.C. App. 1, 12, 351

-55-

S.E.2d 834, 840 (1987) (citation omitted).[12] The key inquiry "is

how . . . ordinary men [would] naturally understand the

publication . . .  stripped of all insinuations, innuendo,

colloquium, and explanatory circumstances . . . ." Id. at 12,

351 S.E.2d at 840-41 (internal quotation marks omitted)

(citation omitted).

    As a general principle, "[i]f a statement 'cannot

"reasonably [be] interpreted as stating actual facts" about an

---

[12] Specifically:

> Under the well established common law of North
> Carolina, a libel per se is a publication by writing,
> printing, signs or pictures which, when considered
> alone without innuendo, colloquium or explanatory
> circumstances: (1) charges that a person has committed
> an infamous crime; (2) charges a person with having an
> infectious disease; (3) tends to impeach a person in
> that person's trade or profession; or (4) otherwise
> tends to subject one to ridicule, contempt and
> disgrace. It is not always necessary that the
> publication involve an imputation of crime, moral
> turpitude or immoral conduct. "But defamatory words to
> be libelous per se must be susceptible of but one
> meaning and of such nature that the court can presume
> as a matter of law that they tend to disgrace and
> degrade the party or hold him up to public hatred,
> contempt or ridicule, or cause him to be shunned and
> avoided."

Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 317-18, 312
S.E.2d 405, 408-09 (1984) (citations omitted).  In this court's
estimation, the only ground Plaintiff could seek to contend that
these statements may have qualified under is the fourth:
ridicule, contempt, or disgrace.

individual[,]' it cannot be the subject of a defamation suit."
Daniels v. Metro Magazine Holding Co., L.L.C., 179 N.C. App.
533, 539, 634 S.E.2d 586, 590 (2006) (citations omitted).
"[P]ure expression[s] of opinion" and "[r]hetorical hyperbole"
would not qualify as predicate statements in a defamation
analysis because either an actual fact would not be asserted or
"a reasonable reader or listener would not construe that
assertion seriously." Id. Circumstances under which the
statement is made are relevant to the assessment of under which
category a statement should fall. Id. at 540, 634 S.E.2d at 590
(citations omitted).

    For libel per se, "[t]he initial question for the court . .
. is whether the publication is such as to be subject to only
one interpretation." Renwick v. News & Observer Publ'g Co., 310
N.C. 312, 318, 312 S.E.2d 405, 409 (1984) (citation omitted).
Even if there is only one interpretation as to Defendant Rapp's
words, Plaintiff has failed to allege a proper claim for libel
per se.

    Daniels, 179 N.C. App. 533, 634 S.E.2d 586 (2006), guides
analysis of this issue. In Daniels, a party objected to an essay
published in a magazine as "malign[ing] her in her profession
and 'g[iving] the impression that [she was] unethical,

unprofessional, unscrupulous, an extremist, and a communist.'"
<u>Id.</u> at 538, 634 S.E.2d at 589. The court determined that "[t]he
majority of statements to which plaintiff objects are clearly
matters of personal opinion, or alternatively, hyperbole no
reasonable reader would believe." <u>Id.</u> at 540, 634 S.E.2d at 591.
Analytical emphasis fell on the inability to prove or disprove a
characterization of "a 'sinister' or 'Gestapo' voice." <u>Id.</u>
Additionally, in general, the <u>Daniels</u> article had a "frivolous
tone and general tenor of absurdity." <u>Id.</u> at 541, 634 S.E.2d at
591 ("[W]hen the article is read as a whole, it is clear that
Reeves' depiction of the processing of his claim is a highly
individualized, personal interpretation tainted by his own
emotions, rather than a journalistic, factual recounting of
events."). Consequently, the court affirmed dismissal of the
libel claims as the statements were "either (1) expressions of
pure opinion not capable of being proven or disproven; or (2)
rhetorical hyperbole which no reasonable reader would
believe[.]" <u>Id.</u> at 542, 634 S.E.2d at 592.

In <u>Skinner v. Reynolds</u>, 764 S.E.2d 652 (N.C. App. 2014),
the court determined that a description of a student's conduct
prefaced with "From my experience with you on this issue"
illustrates "[t]he subjective nature of [the] statement" and its

status as an opinion. Id. at 656. Its status as an opinion was highlighted with reference to the Daniels characterization of a tone as "sinister" or "Gestapo." Id. at 657 (citation omitted).

In keeping with this precedent, Defendant Rapp's statements, even when reasonable (but not extraordinary) inferences are taken in Plaintiff's favor, are statements of opinion. There is a potential inflammatory tone to her language when compared to more neutral descriptors – for instance, she used "ranted" instead of "disagreed", "stormed-out" instead of "left", in addition to the opinions encompassed in "moody" and "immature". However, while Defendant Rapp is providing her recollection of the interaction with Plaintiff, it does not appear to be an unbiased account and opinions clearly permeate the recollections. Further, to the extent this court assumes for the sake of argument that the predicate libel requirements may have been alleged here otherwise, the issue remains that describing a simple disagreement with a "moody" college student who "stormed-out" would not defame Plaintiff. It is not the level of behavior that, even if assumed to be true, would hold her up to ridicule. Merely having a negative opinion about a student and sharing it in a disciplinary form is insufficient to establish a defamation claim.

-59-

Further, Plaintiff does not allege the second type of libel: a publication susceptible of two meanings, one defamatory and the other not, and that the defamatory meaning was the intended and understood meaning. <u>Renwick</u>, 310 N.C. at 316-17, 312 S.E.2d at 408 (citations omitted).

Finally, "[l]ibel <u>per quod</u> 'may be asserted when a publication is not obviously defamatory, but when considered in conjunction with innuendo, colloquium, and explanatory circumstances it becomes libelous." <u>Skinner</u>, 764 S.E.2d at 657-58 (citations omitted). However, for libel <u>per quod</u>, there must be specific allegations of special damages. <u>Id.</u> at 658(citations omitted). <u>Skinner</u> rejected a vague assertion of expenses and lost wages as satisfying the special damages allegation requirement. <u>Id.</u> Consequently, Plaintiff's vague damages allegations are insufficient and she has not stated a sufficient claim for libel <u>per quod</u>, even if the statements themselves were sufficient to support a libel claim.

Plaintiff may dislike how Defendant Rapp characterized her behavior but her claims simply do not rise to the level of

-60-

alleging defamation or libel in any of its forms,[13] and, for this reason, Defendants' motion will be granted as to Count VI.

**I.   <u>Equal Protection Violations</u>**

Count VII alleges that "Defendant Forsyth Technical Community College's disciplinary procedures deny students equal protection as guaranteed under the Fourteenth Amendment . . . and Section Nineteen of the North Carolina State Constitution." (Compl. (Doc. 2) ¶ 82.) Count VII also "alleges that Rule I of Defendant Forsyth Technical Community College's Student Code of Conduct is vague and overly broad." (<u>Id.</u> ¶ 83.) Additionally, to the extent her claims regarding being singled out as a "sister" defy categorization elsewhere, due to her <u>pro se</u> status, this court will consider their merit here.

Plaintiff also argues that her equal protection claim "stems from the inequities evident in the procedure for teacher complaints against students as opposed to the procedure for student complaints against teachers." (Pl.'s Mem. (Doc. 25) at 9.) Teachers can submit promptly acted upon reports and recommendations whereas students have a more laborious process to submit complaints against teachers. (<u>Id.</u> at 9-10.)

---

[13] This conclusion is supported even when presumptions for the sake of argument are made in Plaintiff's favor, as done <u>supra</u>.

Defendants first argue that her "allegation of an 'equal protection' violation is completely vague and conclusory." (Defs.' Mem. (Doc. 17) at 18.) In addressing her claims about the "sisters" language, Defendants posit that they "are aware of no legal authority supporting Chandler's contention that referring to two female siblings as 'the Sisters' violates the Constitution of the United States in any respect." (Defs.' Reply (Doc. 27) at 6.) Defendants further defend that disparities between school procedures for faculty and student complaints do not provide a basis for an equal protection claim. (Id. at 7.)

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" Morrison v. Garraghty, 239 F.3d 648, 653-54 (4th Cir. 2001) (citing U.S. Const. amend. XIV, § 1). And, "the Equal Protection Clause of Article I, § 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." City of Greensboro v. Guilford Cty. Bd. of Elections, 120 F. Supp. 3d 479, 487 (M.D.N.C. 2015) (citation and internal quotation marks omitted).

As a general matter,

-62-

> [t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

Morrison, 239 F.3d at 654 (citations omitted). In discussing the purpose and role of the Equal Protection Clause, the United States Supreme Court clarified that it "does not forbid classifications" and instead "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) (citation omitted) (emphasis added). Cases emphasize its role allowing states to use classifications "for the purposes of legislation." F.S. Royster Guano Co. v. Commonwealth of Virginia, 253 U.S. 412, 415 (1920) (citations omitted).

Plaintiff fails to allege that her supposedly discriminated-against class (students) was similarly situated to those not discriminated against (professors). See Morrison, 239 F.3d at 654. Specifically, there are a number of factors that could significantly distinguish faculty from students and, in the absence of any allegations that the two groups are similarly situated, her claim as to the disciplinary procedures and code of conduct is insufficient. Indeed, Plaintiff's Complaint itself

-63-

does not even lay out a comparison class – it simply alleges that students are denied equal protection. (Compl. (Doc. 2) ¶ 82.)[14] Nevertheless, the comparison between students and teachers is inapt and does not demonstrate them being similarly situated.

Even further, to the extent that Plaintiff claims that the Code of Conduct is "vague and overly broad," (Id. ¶ 83), "[g]iven [a] school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Bethel, 478 U.S. at 686 (citation omitted).

While Plaintiff does in some ways seek to compare herself and her sister to other students in the class, perhaps in an attempt at alleging their similar situations, and even presupposing for the sake of argument that the teacher's instructions could qualify as state action under equal protection analysis, there is no indication that there was no rational basis for her classification. Cf. Shanks v. Forsyth Cty. Park Auth., Inc., 869 F. Supp. 1231, 1235 (M.D.N.C. 1994)

---

[14] However, her briefing clarifies her position and this court considers that explanation, in deference to her pro se status. (Pl.'s Mem. (Doc. 25) at 9-10.)

("[U]nless a classification infringes upon a fundamental right or a suspect class, a law or ordinance must only be rationally related to a legitimate state interest." (citation omitted)). Thus, even if the actions alleged here were to fall under the purview of the Equal Protection Clause, the failure to implicate a suspect class or fundamental right means that only a rational basis for the classification would be required. Cf. id. ("As stated by the Fourth Circuit, '[a] classification subject to rationality review "must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts which could provide a rational basis for the classification."'" (citation omitted)). And, there are certainly reasons why a teacher, in the interest of teaching professionalism, collaboration, and intellectual stimulation, would seek to separate siblings during class. Thus, this court simply cannot comprehend a dynamic in which Plaintiff has alleged equal protection violations.[15]

---

[15] To an extent, the Equal Protection Clause analysis of the "sisters" claim is somewhat inapt. However, to give Plaintiff her due, as her main complaint as to that matter focuses on being singled out, classified, and treated differently, this court at least seeks to provide a potential route of analysis to demonstrate the unviability of her claim.

-65-

For all of these reasons, Defendants' motion will be granted as to Count VII.

**J.   Conspiracy**

Count VIII alleges that the Defendants "manipulated the wording on the complaint with the expressed intention of: a) Meeting the requirement for Student Code of Conduct violation of Rule I, and b) Meeting the standard required to ensure Behavioral intervention." (Compl. (Doc. 2) ¶ 85.)

Defendants first argue that Plaintiff's "own admissions in her Complaint establish that there was ample basis for the referral to mandatory behavioral counseling based on her unjustified refusal to comply with Rapp's request on November 5 and the ensuing behavior that Chandler admits occurred." (Defs.' Mem. (Doc. 17) at 18-19.) They further assert that because conspiracy alone is not illegal, as opposed to conspiracy to commit an illegal act, Plaintiff's allegations here fail on their face because she does not "state any valid claim of illegal activity on the part of the Defendants[.]" (Id. at 19.)

Plaintiff argues that conspiracy includes an agreement "to do a lawful act in an unlawful manner." (Pl.'s Mem. (Doc. 25) at 10 (citation and internal quotation marks omitted).) She asserts that because Defendant Rapp's description of the events in an

-66-

initial email is less "intense" than the description of events "on the Referral form" and because "Rapp and McIntosh conferred about the incident at Hodges' behest," there are sufficient allegations "to prove a conspiracy to manipulate the word[ing] to affect the desired outcome." (Id. at 10-11.)

Defendants reiterate that Plaintiff fails to allege that anything illegal was done or anything legal was done in an unlawful manner and argue that any claim Plaintiff seeks to make therefore fails on its face. (Defs.' Reply (Doc. 27) at 8.)

Civil conspiracy in North Carolina requires that a plaintiff allege "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." State v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008) (citation omitted).[16] Importantly, "there is not a separate civil action for civil conspiracy in North Carolina." Dove v. Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (citations omitted); Fox v. Wilson, 85 N.C. App.

---

[16] North Carolina courts have also described the standard as follows: "A claim for civil conspiracy 'requires the showing of an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way that results in damages to the claimant.'" Combs & Assocs., Inc. v. Kennedy, 147 N.C. App. 362, 373, 555 S.E.2d 634, 642 (2001) (citations omitted).

292, 300, 354 S.E.2d 737, 742-43 (1987) ("[T]here is actually no such thing as an action for civil conspiracy." (citation omitted)). North Carolina courts reiterate that "[i]n civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts" and "[t]he charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." Fox, 85 N.C. App. at 301, 354 S.E.2d at 743 (citation and internal quotation marks omitted).

This court notes Plaintiff's earlier allegations regarding falsification of a government document and that Count VIII "repeats, reiterates, and realleges every allegation contained in" the prior paragraphs. (Compl. (Doc. 2) ¶ 84.) In the falsification count, Plaintiff alleges that Defendant Rapp "[p]ostdated the report;" "[o]mitted pertinent facts;" and "[c]hanged facts to benefit her narrative[.]" (Id. ¶ 77.) However, that count remains insufficient for the reasons discussed supra. Under Count VIII, Plaintiff's allegations focus on "manipulated . . . wording." (Compl. (Doc. 2) ¶ 85.) She argues that the wording became "more intense[.]" (See Pl.'s Mem. (Doc. 25) at 10.)

While Plaintiff alleges that the mere collusion supports a conspiracy, she seeks to read more into the allegations than is present, even with reasonable inferences. Plaintiff also seeks to premise her claim upon the civil conspiracy standard, an improper attempt as that is only a mechanism, not a basis, for a claim, and she fails to allege an additional violation. While inferences of wrongdoing in the presentation of the facts might provide a proper basis for this, because Plaintiff's only other ground in her existing Complaint – the falsification claim – also fails to withstand Defendants' motion, she has not yet alleged a predicate offense upon which to apply her conspiracy allegation.

For these reasons, this court will grant Defendants' motion as to Count VIII.

### K.  **Bullying**

Count IX alleges that Defendant "Rapp's written and verbal characterizations and her conduct throughout the incident constitute bullying as defined by NCGS § 115C-407.15." (Compl. (Doc. 2) ¶ 87.)

Defendants argue that N.C. Gen. Stat. 115C-407.15 "applies to elementary and secondary school students in the public schools, not to community college students" and that "[t]here is

no common-law claim for 'bullying' under North Carolina law." (Defs.' Mem. (Doc. 17) at 19.) They further assert that, at best, Plaintiff only alleged fear of potential bullying "if she returned to class after November 5" and thus no actual bullying occurred. (Id. ("Thus, her claim of 'bullying 'is both factually and legally unsupported.").)

Plaintiff argues that because the actual text says "students," there is no restriction in application and it includes community college students. (See Pl.'s Mem. (Doc. 25) at 11.) She highlights allegedly bullying comments and argues that "Rapp had created a hostile environment, and her behavior clearly meets the standard for bullying." (Pl.'s Mem. (Doc. 25) at 12.)[17]

Defendants reply that "the title of Chapter 115C is 'ELEMENTARY AND SECONDARY EDUCATION'" and thus it is properly limited in application to those contexts. (See Defs.' Reply (Doc. 27) at 8.)

---

[17] Plaintiff also argues that "Rapp's communication that evening was not protected speech because she used 'fighting words.'" (Pl.'s Mem. (Doc. 25) at 12 (citation omitted).) This court does not find a First Amendment analysis of Defendant Rapp's words to be necessary and thus does not address this contention. Relevantly, Defendants argue that lack of First Amendment protection "does not mean that Chandler has a legal claim based on the words." (Defs.' Reply (Doc. 27) at 8.)

-70-

However, a United States District Court for the Eastern District of North Carolina addressing the same statute, 115C-407.15, describes a more fundamental concern that also applies to Plaintiff's claim here:

> In North Carolina, "[g]enerally, a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute." The North Carolina General Assembly has not provided a private cause of action under the ["North Carolina School Violence Prevention Act ("SVPA")]. Moreover, no North Carolina appellate court has construed the SVPA to establish a private cause of action. Thus, [Plaintiff's] SVPA claim fails to state a claim . . . .

Benjamin v. Sparks, No. 4:14-CV-186-D, 2016 WL 1244995, at *12 (E.D.N.C. Mar. 23, 2016) (citing Willett v. Chatham Cty. Bd. of Educ., 176 N.C. App. 268, 272–73, 625 S.E.2d 900, 903 (2006); Lea v. Grier, 156 N.C. App. 503, 508, 577 S.E.2d 411, 415 (2003)).

Even if a private cause of action were to exist, the fundamental issue identified by Defendants – the position of this provision under primary and secondary educational statutory provisions, rather than community college provisions – remains. The session law enacting the School Violence Prevention Act further supports this inference, as it emphasizes that "the sole purpose of this law is to protect all children from bullying and harassment, and no other legislative purpose is

-71-

intended . . . ." 2009-212 N.C. Sess. Laws 1; <u>available at</u>
http://www.ncga.state.nc.us/sessions/2009/bills/senate/pdf/s526v
5.pdf. Community college students will generally be adults and
students in primary and secondary schools will generally be
minors (children), further cementing the inapplicability of the
provision cited by Plaintiff to the community college context.

Because it is questionable whether Plaintiff may even bring
a cause of action under this provision and, even presuming that
she can, her status as a community college student appears to
exempt her from its purview, this court will grant Defendants'
motion as to Count IX.

### L.   **Right to Life**

The final count alleges that "Defendants' conduct caused
Plaintiff embarrassment, humiliation, mental stress and anguish,
delayed graduation, delayed earnings, reduction in earnings,
reduction of retirement benefits, and loss of educational and
employment opportunities." (Compl. (Doc. 2) ¶ 89.)

Defendants argue that "[t]his is not a cognizable claim
under North Carolina statute[s] or North Carolina common law."
(Defs.' Mem. (Doc. 17) at 19.) Further, to the extent that
Plaintiff uses this to claim harm, they argue that her "own
Complaint makes clear that she has no one to blame but herself"

and thus she "alleges no damages that she suffered as a proximate result of the Defendants' actions or omissions." (Id. at 19-20; Defs.' Reply (Doc. 27) at 9-10.)

Plaintiff premises her right to life claim on the due process provisions of the Fifth and Fourteenth Amendments. (Pl.'s Mem. (Doc. 25) at 16.) She argues that diplomas, a student's good reputation, time and money invested in a college degree, and class time are property under this clause and thus the college "cannot take away her property rights arbitrarily." (Id.) She argues that to the extent she is the proximate cause of her damages, she only did so proactively "to avoid an expulsion on her record and to preserve her grades as 'passing.'" (Id. at 16-17.)

To the extent Plaintiff seeks to make a claim about the process to which she was entitled before deprivation of her supposed property rights, the analysis would be properly conducted under the prior due process analysis, supra. For this and the aforementioned reasons regarding due process, this court will grant Defendants' motion with respect to Count X.

## V. CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. 14) is

**GRANTED**[18] and that this case is **DISMISSED.** A judgment consistent with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 19th day of August, 2016.

_____
United States District Judge

---

[18] To the extent that Plaintiff seeks a ruling on her recently filed memorandum to the court (Doc. 28), it is moot based on the holding in this case.

-74-